**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JACOBY DONNER, P.C.,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **ARISTONE REALTY CAPITAL, LLC,** | : | **NO.  17-2206** |
| **TODD M. LIPPIATT, and** | : | |
| **PATRICK M. MCGRATH,** | : | |
| **Defendants.** | : | |

**DuBois, J.**                                                      **August 27, 2020**

**M E M O R A N D U M**

## I.    INTRODUCTION

This action arises out of alleged nonpayment of legal fees.  Plaintiff Jacoby Donner, P.C.,
filed suit in this Court against defendants Aristone Realty Capital, LLC ("Aristone"), and
Aristone principals Todd M. Lippiatt, and Patrick M. McGrath, seeking recovery of outstanding
fees owed for legal services provided to Aristone (the "Collection Claims").  Defendants
answered and asserted counterclaims against Jacoby Donner for malpractice in connection with
the legal services that Jacoby Donner performed (the "Malpractice Claims").

Presently before the Court are the following motions: (1) Jacoby Donner's *Daubert*
motion to exclude expert testimony regarding billing practices; (2) Jacoby Donner's motion to
pierce the corporate veil; (3) Jacoby Donner's motion for partial summary judgment on the
Collection Claims; (4) Aristone, Lippiatt, and McGrath's motion for summary judgment on the
Collection Claims; (5) Jacoby Donner's *Daubert* motion to exclude the expert testimony of Peter
W. Leibundgut, Esquire ("Attorney Leibundgut"), on the Malpractice Claims; (6) Jacoby
Donner's *Daubert* motion to exclude the expert testimony of John Agogliati, III, CFA, ASA, on
malpractice damages; (7) Aristone's *Daubert* motion to exclude the expert testimony of James L.

Griffith, Esquire ("Attorney Griffith"), on the Malpractice Claims; and (8) Jacoby Donner's motion for summary judgment on the Malpractice Claims.  For the reasons stated below, the motions are granted in part and denied in part.

## II.    BACKGROUND[1]

The Court summarizes the relevant factual background in connection with Jacoby Donner's claims, the Collection Claims, and Aristone's claims, the Malpractice Claims.

### A.    Jacoby Donner's Collection Claims

Defendant Aristone is a New York-based real estate development and investment company, in which defendants Lippiatt and McGrath are principals.  Pl.'s Statement Material Facts ("Pl.'s SMF") ¶ 1; Defs.' Statement Undisputed Material Facts ("Defs.' SUMF") ¶ 1. For each of its real estate projects, Aristone established a so-called "single-purpose LLC"[2] ("SPL")—a distinct legal entity—to carry out the project.  Pl.'s SMF ¶ 2.  Between February of 2010 and April of 2016, Aristone retained plaintiff Jacoby Donner to provide transactional legal services for Aristone and its various SPLs.  Pl.'s SMF ¶ 3.  Aristone did not retain Jacoby Donner to perform any litigation work.  Countercl. Def.'s Statement Uncontested Material Facts ("Countercl. Def.'s SUMF") ¶ 175.  Eric Diaz, Esquire ("Attorney Diaz"), a Jacoby Donner partner, was the law firm's primary point of contact with Aristone, through McGrath and Lippiatt.  Defs.' SUMF ¶ 2.

On June 25, 2015, after Aristone accumulated multiple outstanding invoices, Jacoby Donner and Aristone entered into a written Fee Agreement that established payment terms for

---

[1] The facts are presented in the light most favorable to the non-moving party.  Disputed facts are noted as such. Where appropriate, the parties' statements of material facts are cited in lieu of a direct citation to the record.
[2] During his deposition, McGrath referred to these entities as both "single-purpose LLCs" and "special purpose LLCs."  McGrath Dep. 449:21–24.  Jacoby Donner refers to these LLCs as "special purpose entities" in its filings. Pl.'s SUMF ¶ 2.  For consistency, the Court will use the term "SPL."  The SPLs are legal entities separate from Aristone.

future invoices.  Pl.'s SMF ¶ 4.  The Fee Agreement was a two-page letter written by Attorney

Diaz and addressed to McGrath.  According to the Fee Agreement, Aristone retained Jacoby

Donner to "represent Aristone Realty Capital, LLC and its affiliates, successors and assigns

(collectively, 'Aristone') in connection with various commercial real estate and financial

transactions."  Pl.'s Mot. Partial Summ. J. Ex. 2, Ex. A ("Fee Agreement") 1.  The Fee

Agreement also provided, in relevant part:

> This letter will supersede all prior agreements between Aristone and
> [Jacoby Donner], confirm that Aristone has engaged [Jacoby Donner] in
> connection with the Existing Matters, owes [Jacoby Donner] outstanding
> fees on the existing Matters in the approximate current amounts of $450,000
> (204 South Galena), $100,000 (66 East 11th), and $175,000 (Paradiso), and
> set forth the arrangement pursuant to which [Jacoby Donner] will continue
> to represent Aristone on the Existing Matters and on any new matters (the
> "New Matters").
>
> As a general matter, unless otherwise specified in this engagement letter,
> the terms of [Jacoby Donner's] engagement will be in accordance with
> [Jacoby Donner's] Standard Terms and Conditions of Engagement
> ("Standard Terms"), a copy of which is attached. . . .
>
> As a condition, and in consideration, of our continuing to represent Aristone
> on the Existing Matters and on any new Matters, Aristone [a]grees to pay
> legal fees and costs due to [Jacoby Donner] in connection with New Matters
> in accordance with the Standard Terms, and in connection with the Existing
> Matters in amounts consistent with Aristone's available cash from revenue,
> as may [sic] audited and confirmed by [Jacoby Donner] from time to time,
> but in no event less than $10,000 per month."

*Id.*  The Fee Agreement was executed on Aristone's behalf by McGrath and on Jacoby Donner's

behalf by Attorney Diaz.  *Id.*  In the Complaint, Jacoby Donner alleges, *inter alia*, that

defendants breached the Fee Agreement and owe a balance of $942,119.26 for legal services

performed on Existing[3] and New Matters.

---

[3] The two Aristone matters at the center of the Malpractice Claims—the joint venture involving Rocky Aspen, LLC, and the acquisition of CS Paradiso Holdings, LLC—were among the Existing Matters referenced in the Fee Agreement.

Central to the Collection Action is the parties' dispute over the terms of their fee arrangement prior to June 25, 2015, and how the Fee Agreement altered Aristone's payment obligations on Existing Matters.  Pointing to the testimony of Attorney Diaz and McGrath, Aristone contends that, before executing the Fee Agreement, Aristone and Jacoby Donner were engaged in an unwritten "hybrid contingency" arrangement in which Aristone's payment of invoices for a particular project was contingent upon the project generating a profit.  *See* Defs.' Mot. Summ. J. 18 n.8.  Attorney Diaz stated that "because of my relationship with Patrick McGrath . . . we had more of something that approached a contingency. . . . [T]he arrangement was that, if the deal doesn't print, then we don't get paid from that deal, because there isn't any money to get paid from."  Diaz Day 1 Dep. 50:1–12, 50:23–51:2.  Similarly, McGrath testified that "the reality is that a deal that doesn't close doesn't generate any revenue . . . which means the legal bill doesn't get paid."  McGrath Dep. 74:15–22.  Based on this testimony, defendants further contend that after issuing an invoice, the parties reviewed and negotiated the fees to be paid, and "[w]hen there was insufficient capital in a transaction, legal fees would be reduced or waived."  Defs.' Mot. Summary J. 5.  Jacoby Donner denies that it ever operated under such an arrangement with Aristone.  Pl.'s Resp. Defs.' SUMF ¶¶ 4, 7.

In or around early April of 2016, Attorney Diaz left Jacoby Donner and joined the law firm of LareDiaz.  Pl.'s Resp. Def.'s SUMF ¶ 10.  Shortly thereafter, Jacoby Donner transferred its files in Aristone matters to LareDiaz and the relationship between Jacoby Donner and Aristone ended.  *Id.*  As of January 4, 2019, Aristone still retained Attorney Diaz for transactional legal work.  *Id.*  Jacoby Donner ceased business operations shortly before the Collection Claims were filed on May 12, 2017.

4

### B.     Aristone's Malpractice Claims

In response to Jacoby Donner's Collection Claims, defendants filed counterclaims alleging that Jacoby Donner committed legal malpractice in connection with two Aristone matters: (1) a real estate project to develop a restaurant and lounge in Aspen, Colorado (the "Rocky Aspen Claim"); and (2) the purchase of CS Paradiso Holdings LLC ("CS Paradiso") and its portfolio of properties and loans.

Defendants' malpractice allegations arise from Jacoby Donner's work on behalf of two SPLs that are legally distinct from Aristone: AH DB Kitchen Aspen Investors, LLC ("AH DB"), and Flatiron Acquisition Vehicle, LLC ("Flatiron Acquisition").  Critically, AH DB and Flatiron Acquisition are not parties to the Malpractice Claims.

### 1.     The Rocky Aspen Claim

Aristone first alleges that Jacoby Donner mishandled a series of transactions involving a joint venture between AH DB and Rocky Aspen Management 204, LLC ("RAM").  Countercl. Def.'s SUMF ¶ 10.  On April 29, 2013, AH DB and RAM formed Rocky Aspen, LLC, to develop a restaurant and lounge in Aspen.  *Id.* ¶ 32.  Between 2013 and 2016, AH DB was owned in part by Aristone.  *Id.* ¶ 13.  RAM was owned entirely by a separate company, Watershed Ventures, LLC ("Watershed").  *Id.* ¶ 12.

Pursuant to the joint venture agreement, AH DB was required to provide the capital for the restaurant and RAM was to provide restaurant management expertise.  Defs.' SUMF ¶ 29.  In addition, McGrath was named a co-manager of Rocky Aspen.  Counterclaim Def.'s SUMF ¶ 88.

By early December of 2014, the Rocky Aspen project was over-budget.  Counterclaim Def.'s Mot. Summ. J. 11; Def.'s SUMF ¶ 33.  In addition, on or about December 4, 2014, the owner of the building in which the restaurant was located sued Rocky Aspen and defendant

McGrath for non-payment of rent and construction costs. Countercl. Def.'s SUMF ¶ 72. In response to the increasing costs, AH DB and RAM entered into an amended joint venture agreement on December 1, 2014. *Id.* ¶ 36. The amended joint venture agreement required, *inter alia*, that AH DB make additional "capital contributions," failing which RAM was entitled to exercise an option (the "Watershed Option") for additional shares in the venture. *Id.* ¶¶ 36, 47–49. Under the amended joint venture agreement, if AH DB made the required capital contributions, its interest in Rocky Aspen would increase to 60 percent. *Id.* ¶ 49. Conversely, if AH DB failed to make the required capital contributions, its interest in Rocky Aspen would drop from 50 percent to five percent. *Id.* ¶¶ 47–48.

AH DB took the following steps to secure more capital for Rocky Aspen. First, on December 1, 2014, in connection with executing the amended joint venture agreement, AH DB obtained a $700,000 loan from Watershed ("Watershed Loan") as a temporary solution until AH DB could secure long-term financing. *Id.* ¶¶ 55, 57. AH DB failed to repay the Watershed Loan on time and requested multiple extensions, paying fees for each extension. *Id.* ¶ 73; Defs.' SUMF ¶ 39. In response, AH DB and RAM amended the joint venture agreement again on March 20, 2015, but the capital contributions requirements and Watershed Option remained in place. Countercl. Def.'s SUMF ¶¶ 76–83. In April 2015 and July 2015, AH DB arranged for two additional loans to fund Rocky Aspen. *Id.* ¶¶ 84, 94; Countercl. Def.'s Mot. Summ. J. 14. In connection with the second loan—a $3.2 million loan from Hanford Holdings, LLC ("Hanford Loan")—McGrath, on behalf of AH DB, executed a binding term sheet that acknowledged that

AH DB failed to make the required capital contributions and that its failure triggered RAM's right to exercise the Watershed Option.  Countercl. Def.'s SUMF ¶¶ 96–97.[4]

The Rocky Aspen lounge opened on or about December 18, 2015, and the restaurant opened on or about December 31, 2015.  *Id.* ¶¶ 150, 155.  Shortly thereafter, on January 5, 2016, RAM notified AH DB that it was exercising the Watershed Option due to AH DB's failure to make the required capital contributions to Rocky Aspen.  *Id.* ¶ 157.  As a result of the asserted exercise of the Watershed Option by RAM, RAM  claimed control of Rocky Aspen and removed McGrath as a co-manager.  Countercl. Def.'s Summ. J. R. ("SJR") 0561 ("McGrath Aff.") ¶ 16; Defs.' SUMF ¶ 50.  By letter dated January 25, 2016, Jacoby Donner contested RAM's right to exercise the Watershed Option, contending that the various loans constituted capital contributions under the Rocky Aspen amended joint venture agreement.  Countercl. Def.'s SUMF ¶¶ 160– 61.

AH DB and RAM continued to dispute whether the Watershed Option was triggered until at least on or about February 3, 2016.  *Id.* ¶ 163.  On February 29, 2016, AH DB received notice that it defaulted on the Hanford Loan.  *Id.* ¶ 169.  Rocky Aspen ultimately filed for bankruptcy on March 11, 2016.  *Id.* ¶ 174; *see also In re Rocky Aspen, LLC*, No. 16-12194 EEB, 2016 Bankr. LEXIS 4580 (Bankr. D. Colo. June 22, 2016).

In support of the Rocky Aspen Claim, Aristone maintains that, under the amended joint venture agreement, the various loans executed by Aristone affiliates and McGrath qualified as capital contributions to Rocky Aspen.  On that ground, Aristone claims that Jacoby Donner failed to properly "document" those contributions and proactively negotiate with RAM over its

---

[4] This account is consistent with the factual background summarized in *In re Rocky Aspen, LLC*, No. 16-12194 EEB, 2016 Bankr. LEXIS 4580 (Bankr. D. Colo. June 22, 2016), in which the United States Bankruptcy Court for the District of Colorado denied the motion to dismiss of AH DB and Hanford Holdings in the Rocky Aspen bankruptcy proceedings.

exercise of the Watershed Option.  Countercl. Def.'s SUMF ¶¶ 146, 165, 168.  Aristone alleges that those failures reduced Aristone's equity and control of the Rocky Aspen venture and caused the loss of the Rocky Aspen investment.

### 2. *CS Paradiso: The TVPOA II Settlement Claim*

Second, Aristone alleges that Jacoby Donner mishandled a transaction involving another non-party SPL, Flatiron Acquisition.  Flatiron Acquisition is owned entirely by Castlegrace Management, LLC ("Castlegrace"), which in turn is owned in part by defendant McGrath.  *Id.* ¶¶ 218–222.  Aristone does not own any shares of Flatiron Acquisition.  *Id.* ¶ 224.

On July 23, 2013, Flatiron Acquisition purchased CS Paradiso from non-party seller, Capital Source Commercial Loan, LLC ("Capital Source").  *Id.*  ¶ 214.  With the purchase, Flatiron Acquisition acquired a portfolio of approximately 6,000 properties or mortgages held by CS Paradiso (the "NRP Portfolio").  *Id.* ¶¶ 215–16.  Aristone does not own any shares of CS Paradiso.  *Id.* ¶ 225.

The NRP Portfolio included properties in a Tennessee real estate development named Tellico Village.  Aristone alleges that Jacoby Donner was responsible for the delay in delivery of a quitclaim deed for certain properties in Tellico Village, requiring CS Paradiso to settle a lawsuit filed by the Tellico Village Property Owners Association ("TVPOA").   During due diligence on the CS Paradiso purchase, buyer Flatiron Acquisition, the Aristone SPL, discovered that TVPOA had sued CS Paradiso in Tennessee state court in 2010 over unpaid assessments on certain parcels of land ("TVPOA I").  *Id.* ¶¶ 227, 231.  Before finalizing the purchase of CS Paradiso on July 23, 2013, Flatiron Acquisition required that Capital Source, CS Paradiso's seller, settle the TVPOA I lawsuit.  *Id.* ¶ 232.  As directed by Flatiron Acquisition, Capital Source and TVPOA entered into a settlement agreement ("TVPOA I Settlement Agreement")

which required, *inter alia*, the execution of certain quitclaim deeds on behalf of CS Paradiso and

lien releases on behalf of Capital Source to TVPOA on or before August 19, 2013.  *Id.*  ¶ 229.

Capital Source retained Tennessee counsel, Oliver Adams, Esquire ("Attorney Adams"), to file

the TVPOA quitclaim deeds and lien releases.  *Id.* ¶ 233.

On December 23, 2013—approximately four months after the August 19, 2013 deadline

for delivery of quitclaim deeds—McGrath, on behalf of CS Paradiso, executed a single quitclaim

deed that had been prepared by Attorney Adams for properties listed in the TVPOA I Settlement

Agreement.  *Id.* ¶ 236.  McGrath testified that Jacoby Donner sent him the quitclaim deed for his

signature, which he agreed to as a "courtesy" to Capital Source.  *Id.*; Countercl. Def.'s Mot.

Summ. J. 26.  It is undisputed that "Jacoby Donner obtained Patrick McGrath's signature on the

Quit Claim [sic] Deed solely for the purpose of delivering the document to [Attorney] Adams."

Countercl. Def.'s SUMF ¶ 237.  Aristone admits that it does not know the date that Jacoby

Donner ultimately delivered the quitclaim deed to Attorney Adams, but in a separate lawsuit

filed against Capital Source in the U.S. District Court for the Southern District of New York,

Flatiron Acquisition and CS Paradiso alleged that the quitclaim deed was delivered no later than

March 19, 2014.  *Id.* ¶ 255; *see also Acquisition Vehicle LLC et al. v. CSE Mortgage LLC et al.*,

No. 17-cv-08987 (S.D.N.Y. filed Nov. 16, 2017)*.*

On May 7, 2015, following Flatiron Acquisition's purchase of CS Paradiso, TVPOA filed

a second lawsuit ("TVPOA II") in Tennessee state court, against, *inter alia*, CS Paradiso, for

violation of the TVPOA I Settlement Agreement.  *Id.* ¶ 240.  On April 11, 2017, CS Paradiso

entered into a settlement agreement to resolve TVPOA II ("TVPOA II Settlement Agreement").

*Id.* ¶ 246.  McGrath testified that, under the terms of the TVPOA II Settlement Agreement,

another non-party Aristone affiliate, Flatiron Loan Investors, LLC ("Flatiron Investors"), paid

$330,000 to TVPOA.  *Id.* ¶ 247.  Defendants, however, have not produced documentation of any payment from Flatiron Investors to TVPOA.  *Id.* ¶ 248.  Aristone alleges that Jacoby Donner's delay in delivering the quitclaim deed to Attorney Adams prompted the filing of TVPOA II and ultimately forced CS Paradiso to settle the lawsuit (the "TVPOA II Settlement Claim").

3.     *Evidence of Additional Instances of Malpractice*

In its motion for summary judgment on Aristone's Malpractice Claims, Jacoby Donner notes that the record contains evidence of two additional putative grounds of claimed malpractice in connection with Flatiron Acquisition and the CS Paradiso matter.  First, Aristone's proposed legal expert, Attorney Leibundgut, stated in his report that Jacoby Donner failed to respond to a lawsuit filed against CS Paradiso by the Hot Springs Village Property Owners Association, another homeowners' association in the NRP Portfolio, which resulted in a default judgment that was eventually settled for "approximately $80,000" (the "HSVPOA Default Judgment Claim"). Leibundgut Rep. 13.

Second, McGrath stated that much of Jacoby Donner's ongoing work servicing the NRP Portfolio—separate from the property transfers required by the TVPOA II Settlement Agreement—"was done incorrectly or done poorly or done not at all" (the "Servicing Claim"). Countercl. Def.'s SUMF. ¶ 270.  According to McGrath, on various occasions Jacoby Donner failed to complete or record conveyances, mortgage satisfactions, and amendments pursuant to the policies and procedures ("NRP Policies and Procedures") that Jacoby Donner had established for its work on the NRP Portfolio.  McGrath Dep. 128:6–130:15.  McGrath further testified that, as a result of Jacoby Donner's poor work servicing the NRP Portfolio, he estimated that Aristone paid LareDiaz—Attorney Diaz's new firm after leaving Jacoby Donner—"$100,000-ish" for remedial legal services.  Countercl. Def.'s SUMF ¶ 291.

10

### C.    Procedural Background

Jacoby Donner filed this action on May 12, 2017.  In response, defendants Aristone,

McGrath, and Lippiatt filed an Amended Answer, Defenses and Counterclaims (Document No.

10, filed July 6, 2017), in which defendants asserted two counts of legal malpractice: Count I for

breach of contract and Count II for negligence.  On July 27, 2017, Jacoby Donner filed a motion

to dismiss the Aristone counterclaims (Document No. 14).  By Memorandum and Order dated

April 2, 2018 (Document No. 46), the Court dismissed the counterclaims asserted by McGrath

and Lippiatt on standing grounds and dismissed Count I, the breach of contract count, in its

entirety.  Aristone's counterclaim for legal malpractice sounding in tort remains.

After the Court ruled on Jacoby Donner's motion to dismiss, the parties engaged in a

protracted and contentious discovery process, during which Jacoby Donner filed various

motions, including a motion to pierce the corporate veil (Document No. 107, filed August 23,

2018).  The Court denied the motion to pierce the corporate veil without prejudice as premature

by Order dated September 25, 2018 (Document No. 126).  The parties thereafter filed the

following motions, which are now pending before the Court:

- Collection Claims: (1) Jacoby Donner's *Daubert* motion to exclude expert testimony regarding billing practices (Document No. 154, filed December 10, 2018); (2) Jacoby Donner's motion for partial summary judgment (Document No. 155, filed December 10, 2018); (3) Jacoby Donner's motion to pierce the corporate veil (Document No. 153, filed December 10, 2018); and (4) Aristone, Lippiatt, and McGrath's motion for summary judgment (Document No. 158, filed December 11, 2018).

- Malpractice Claims: (1) Jacoby Donner's *Daubert* motion to exclude the testimony of proposed legal expert Attorney Leibundgut regarding legal malpractice liability (Document No. 157, filed December 10, 2018); (2) Jacoby Donner's *Daubert* motion to exclude the testimony of proposed valuation expert John Agogliati, III, CFA, ASA regarding damages (Document No. 156, filed December 10, 2018); (3) Aristone's *Daubert* motion to exclude the testimony of proposed legal expert Attorney Griffith (Document No. 160, filed December 11,

2018); and (4) Jacoby Donner's motion for summary judgment (Document No. 152, filed December 7, 2018).

The motions are fully briefed and ripe for decision.

## III.   LEGAL STANDARD

### A.   *Daubert* Motions

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The rule requires the Court to act as a gatekeeper and is applicable to scientific testimony and testimony based on "technical" and "other specialized" knowledge. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).  A court must determine whether an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Id.* at 152.

Rule 702 has a "liberal policy of admissibility."  *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)).  As such, the "rejection of expert testimony is the exception and not the rule."  *Dorman Prods. v. PACCAR, Inc.*, 201 F. Supp. 3d 663, 686 (E.D. Pa 2016) (quoting Fed. R. Evid. 702 advisory committee's note).

In the Third Circuit, courts must address a "trilogy of restrictions" before permitting the admission of expert testimony: qualification, reliability and fit.  *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003); *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000).  The party

offering the expert must prove each requirement by a preponderance of the evidence.  *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999).

       *1.*     *Qualification*

       "To qualify as an expert, Rule 702 requires the witness to have 'specialized knowledge' regarding the area of testimony."  *Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 335 (3d Cir. 2002) (quoting *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998)).  The Third Circuit has instructed courts to interpret the qualification requirement "liberally" and not to insist on a certain kind of degree or background when evaluating the qualifications of an expert.  *See Waldorf*, 142 F.3d at 625.  "The language of Rule 702 and the accompanying advisory committee notes make clear that various kinds of 'knowledge, skill, experience, training, or education' qualify an expert as such."  *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 855 (3d Cir. 1990) [hereinafter "*Paoli I*"] (quoting Fed. R. Evid. 702).

       Moreover, "[t]his liberal policy of admissibility extends to the substantive as well as the formal qualifications of experts."  *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008).  Thus, "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate."  *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996).

       *2.*     *Reliability*

       The reliability requirement "means that the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief."  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994) [hereinafter "*Paoli II*"] (quoting *Daubert v. Merrell*

*Dow Pharm., Inc.*, 509 U.S. 579, 590, (1993)).  The test of reliability is "flexible" and "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination."  *Kumho Tire*, 526 U.S. at 141–42 (emphasis omitted).  In determining whether the reliability requirement is met, courts examine the following factors where appropriate:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*United States v. Mitchell*, 365 F.3d 215, 235 (3d Cir. 2004) (citing *Paoli II*, 35 F.3d at 742 n.8). These factors are "neither exhaustive nor applicable in every case."  *Kannankeril*, 128 F.3d at 806–07.

Under the reliability prong, parties "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable."  *Paoli II*, 35 F.3d at 744 (emphasis omitted).  "As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies."  *Mitchell*, 365 F.3d at 244 (quoting *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)).

### 3. Fit

For expert testimony to meet the "fit" requirement, it must "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. "This condition goes primarily to relevance. Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (internal citations omitted). "'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Id.*

### B. Summary Judgment

The Court will grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Court's role at the summary judgment stage "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether . . . there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. However, the existence of a mere "scintilla" of evidence in support of the nonmoving party is insufficient. *Id.* at 252. In making this determination, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007) (internal citations omitted). The party opposing summary judgment must, however, identify evidence that supports each element on which it has the burden of proof. *Celotex Corp.*, 477 U.S. at 322.

## IV.     THE COLLECTION CLAIMS

The Court first addresses Jacoby Donner's motion to preclude expert testimony regarding billing practices before turning to the parties' motions for summary judgment and Jacoby Donner's motion to pierce the corporate veil.

### A.     Jacoby Donner's *Daubert* Motion to Exclude Expert Testimony on Billing Practices

To bolster their defense against Jacoby Donner's Collection Claims and support Aristone's Malpractice Claims, defendants offer the testimony of Attorney Leibundgut as an expert on legal billing practices and the professional standard of care for attorneys performing real estate transactions.  Jacoby Donner has filed two motions to exclude Attorney Leibundgut's testimony—the first addressing his opinions on Jacoby Donner's billing practices and the second addressing his opinions on liability and the legal standard of care.

The Court first addresses that part of Attorney Leibundgut's report and testimony regarding Jacoby Donner's billing practices.[5]  Specifically, in his report Attorney Leibundgut opines: (1) that the alleged "hybrid contingency" fee arrangement between Jacoby Donner and Aristone was a standard billing approach for "the type of transactional lending and investment business" that defendants conducted; (2) that "the manner in which [Jacoby Donner] billed [d]efendants was haphazard, untimely, improperly documented, often unedited and, in totality unconscionable"; and (3) that Jacoby Donner failed to review the financial performance of Aristone's "Existing Matters" to determine whether Aristone owed fees over the $10,000 monthly minimum requirement, as provided for in the Fee Agreement.  Leibundgut Rep. 3.

Jacoby Donner advances two arguments in its *Daubert* motion: (1) that the Court should

---

[5] The Court addresses Jacoby Donner's separate motion to exclude Attorney Leibundgut's testimony on malpractice liability in Section V.A.1, *infra*.

bar defendants from introducing any expert testimony in connection with the Collection Claims

and (2) all of Attorney Leibundgut's testimony related to billing practices should be excluded for

lack of "fit."  As an initial matter, the Court notes that defendants have not identified any

proposed experts to testify on the Collection Claims other than Attorney Leibundgut.  As such,

the Court denies Jacoby Donner's motion to the extent it seeks to exclude any testimony other

than that of Attorney Leibundgut.

With respect to Attorney Leibundgut, Jacoby Donner argues that his proposed expert

testimony on billing practices is unnecessary and irrelevant in a lawsuit for unpaid legal fees.  In

addition, Jacoby Donner notes that defendants represented to the Court that they would not call

an expert witness in connection with the Collection Claims.  *See* Ct. Order dated November 7,

2017 (Document No. 30) (stating that "Counsel reported that they did not plan to call any expert

witnesses in plaintiff's case"); Ct. Order dated June 25, 2018 (Document No. 89) (same).  In

response, defendants contend that Attorney Leibundgut's opinions on billing practices will be

helpful to the jury solely on the ground that his opinions pertain to the reasonableness of Jacoby

Donner's fees and the enforceability of the Fee Agreement.  The Court agrees with Jacoby

Donner on this issue.

In general, the reasonableness of fees is relevant in attorney-client fee disputes.  *See, e.g.*,

*McKenzie Const., Inc. v. Maynard*, 758 F.2d 97, 100 (3d Cir. 1985) ("An attorney has the burden

of proof as to the reasonableness of his fee when he sues to recover from his client.").  Such

information is relevant because "it is the [C]ourt's responsibility to assess the reasonableness of

the fee" when determining the enforceability of a legal fee arrangement, due to the Court's

authority to regulate attorney-client relations.  *Raymark Industries, Inc. v. Butera, Beausang,*

*Cohen & Brennan*, No. CIV.A. 97-0034, 1997 WL 746125, at *8 (E.D. Pa. Dec. 1, 1997).

Moreover, "[w]hen a jury, rather than a judge, is to make the determination of the reasonableness and necessity of the charges, expert testimony is required as to the value of the services rendered." *Black v. Stephens*, 662 F.2d 181, 201 (3d Cir. 1981).  Notwithstanding this authority, the Court concludes that Attorney Leibundgut's testimony on billing practices is inadmissible for lack of "fit" with respect to the Collection Claims.

Contrary to defendants' argument, Attorney Leibundgut fails to opine upon the value of Jacoby Donner's legal services and the reasonableness of its outstanding legal fees.  The Third Circuit has held that, "[i]n addition to ascertaining the number of hours spent and the nature of the services rendered, a determination of the reasonable value of legal work requires a finding of a reasonable hourly rate for each attorney involved, based on his legal reputation, experience, and type of work done." *Black*, 662 F.2d at 202.  In this case, Attorney Leibundgut has provided no testimony that bears on these issues.

Attorney Leibundgut concluded that, while the "hybrid contingency" arrangement was standard for the industry, Jacoby Donner handled billing "in a very inappropriate and unprofessional manner" on the ground that, when Attorney Diaz approached McGrath to sign the Fee Agreement, he "presented [McGrath] with a boatload of bills, 14 or 15 months' worth of bills, with [no real] forewarning . . . that hadn't even been edited or reviewed by the timekeepers."  Leibundgut Dep. 296:23–24, 276:12–19.  Significantly, Attorney Leibundgut admitted that such timing "has nothing to do with the bill not being due" and collectible—the central issue in the Collection Claims.  *Id.* 296:19–297:2.  Further, Attorney Leibundgut admitted that he did not review Jacoby Donner's invoices in detail and offered no opinion about the number of hours Jacoby Donner attorneys worked or the nature of their work.  *Id.* at 266:4–266:22.  *Cf. Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.*, 487 F.2d

161, 167 (3d Cir. 1973) ("[W]ithout some fairly definite information as to the hours devoted to various general activities, *e.g.*, pretrial discovery settlement negotiations . . . the court cannot know the nature of the services for which compensation is sought."). As such, Attorney Leibundgut's testimony that the "hybrid contingency" arrangement was standard industry practice and that Jacoby Donner's billing practices were "unprofessional" will be excluded.

The Court concludes that Attorney Leibundgut's remaining opinion—that Jacoby Donner failed to exercise its right under the Fee Agreement to audit the financial performance of the Existing Matters—is also inadmissible under Rule 702. As a preliminary matter, the fact that Jacoby Donner did not audit the financial performance of the Existing Matters can be understood by a layperson without the aid of expert testimony, rendering such testimony unhelpful. *See, e.g.*, *Senese v. Liberty Mut. Ins. Co.*, 661 F. App'x 771, 775 (3d Cir. 2016) (holding that expert testimony is not helpful under Rule 702 when "when the untrained layman would be qualified to determine . . . the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute") (internal quotation marks omitted). Moreover, when asked why he included the opinion regarding the alleged failure of Jacoby Donner to audit the financial performance of the Existing Matters in his report, Attorney Leibundgut did not mention the question whether Jacoby Donner's fees were reasonable; rather, he merely opined that such failure "show[ed] bad faith" by Jacoby Donner. Leibundgut Dep. 298:17–19. Attorney Leibundgut further stated that while Jacoby Donner's failure to review the financial performance of the Existing Matters "might" affect the amount Aristone owes under the Fee Agreement, he admitted that he "d[idn't] know what the books and records might say . . . [and] can't comment because I haven't seen them." *Id.* at 298:23–299:5.

In sum, the Court determines that Attorney Leibundgut's three opinions regarding Jacoby Donner's billing practices will not assist the jury in understanding the evidence on the Collection Claims. The Court thus concludes that those opinions are inadmissible and grants Jacoby Donner's *Daubert* motion to the extent it seeks to exclude Attorney Leibundgut's testimony on billing practices.

**B.     Motions for Summary Judgment filed by Jacoby Donner and Defendants Aristone, McGrath, and Lippiatt**

As discussed *supra*, Jacoby Donner asserts three claims related to Aristone's alleged failure to pay legal fees under the Fee Agreement: breach of contract (Count I); account stated (Count II); and unjust enrichment (Count III). Jacoby Donner moved for partial summary judgment on its breach of contract claim (Count I) and defendants moved for summary judgment on all three counts of the Complaint. After careful review of the record, the Court denies Jacoby Donner's partial motion for summary judgment and defendants' motion for summary judgment as it relates to Jacoby Donner's breach of contract claim. The Court grants defendants' motion for summary judgment with respect to the account stated claim and unjust enrichment claim.

At the center of the parties' dispute over legal fees is the Fee Agreement executed by Jacoby Donner and Aristone on June 25, 2015. The Fee Agreement provided in relevant part:

> This letter will supersede all prior agreements between Aristone and [Jacoby Donner], confirm that Aristone has engaged [Jacoby Donner] in connection with the Existing Matters, owes [Jacoby Donner] outstanding fees on the existing Matters in the approximate current amounts of $450,000 (204 South Galena), $100,000 (66 East 11th), and $175,000 (Paradiso), and set forth the arrangement pursuant to which [Jacoby Donner] will continue to represent Aristone on the Existing Matters and on any new matters (the "New Matters").
>
> As a general matter, unless otherwise specified in this engagement letter, the terms of [Jacoby Donner's] engagement will be in accordance with [Jacoby Donner's] Standard Terms and Conditions of Engagement ("Standard Terms"), a copy of which is attached. . . .

> As a condition, and in consideration, of our continuing to represent Aristone
> on the Existing Matters and on any new Matters, Aristone [a]grees to pay
> legal fees and costs due to [Jacoby Donner] in connection with New Matters
> in accordance with the Standard Terms, and in connection with the Existing
> Matters in amounts consistent with Aristone's available cash from revenue,
> as may [sic] audited and confirmed by [Jacoby Donner] from time to time,
> but in no event less than $10,000 per month."

Fee Agreement 1.  Jacoby Donner alleges that defendants breached the Fee Agreement and owe

a balance of $942,119.26 for legal services performed on Existing and New Matters.

### 1.    *Breach of Contract (Count I)*

A breach of contract claim requires proof of three elements: "(1) the existence of a

contract, including its essential terms, (2) a breach of the contract; and (3) resultant

damages."  *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone*

*Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016).  Jacoby Donner argues that, pursuant to the

Fee Agreement, Aristone agreed that it owed Jacoby Donner a balance of $725,000—the sum of

the three amounts listed in that document—for legal services on Existing Matters and committed

to pay that $725,000 balance in amounts of no less than $10,000 per month.  *See* Pl.'s Mot.

Partial Summ. J. 9; Pl.'s Reply Br. in Supp. of Mot. Partial Summ. J. 3.  Further, Jacoby Donner

asserts that Aristone has paid only $35,441.26 toward the $725,000 balance and therefore owes a

remainder of $689,558.74 for the Existing Matters.  In moving for partial summary judgment,

Jacoby Donner addresses only the unpaid amount of the approximate $725,000 balance as of

June 25, 2015.  The alleged remainder of $252,560.52 in fees at issue in the Collection Claims—

for additional legal work performed after the execution of the Fee Agreement[6]—is not addressed

in Jacoby Donner's motion for partial summary judgment.  *See* Pl.'s Mot. Summ. J. 2 n.1.

---

[6] Based on the current state of the record, it is not clear whether the alleged unpaid remainder of $252,560.52
claimed in the Complaint is related to the Existing Matters or New Matters, or some combination of both.  Neither
party addresses this issue in the briefs.

In response, Aristone contends that, consistent with the parties' prior dealings, the Fee Agreement did not obligate it to pay the full $725,000. Instead, the Fee Agreement required that (1) Aristone pay at least $10,000 per month on Existing Matters for the duration of its relationship with Jacoby Donner; and (2) that the parties would continue to negotiate invoices on an ongoing basis based on the financial performance of the real estate projects associated with the Existing Matters. *See* Defs.' Resp. Pl.'s Mot. Partial Summ. J. 4, 11. Aristone contends that it met those obligations on the Existing Matters, making payments of at least $10,000 per month between June 25, 2015 and the end of its relationship with Jacoby Donner. *Id.* at 4. Jacoby Donner replies that the parties' prior dealings are irrelevant on the ground that the Fee Agreement expressly states that it "will supersede all prior agreements" between the parties. Fee Agreement 1. Further, Jacoby Donner disputes that Aristone made monthly payments of at least $10,000 on Existing Matters following the execution of the Fee Agreement.[7]

The parties' disagreement about Aristone's payment obligations under the Fee Agreement raises the issue of contract ambiguity. "[A] contract is ambiguous, and thus presents a question of interpretation for a jury, if the contract 'is reasonably susceptible of different constructions and capable of being understood in more than one sense.'" *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009) (quoting *Allegheny Int'l v. Allegheny Ludlum Steel Corp.*, 40 F.3d 1416, 1425 (3d Cir. 1994)); *see also Trizechahn Gateway LLC v. Titus*, 601

---

[7] In their motion for summary judgment, defendants cite two pieces of evidence that Aristone paid at least $10,000 per month for Existing Matters between June 25, 2015, and the end of its relationship with Jacoby Donner in April of 2016, pursuant to their interpretation of the Fee Agreement: First, Attorney Diaz's testimony that he "seem[ed] to recall a couple $10,000 payments, maybe," Diaz Day 2 Dep. 57:5–17; and second, a spreadsheet titled "Aristone Payment Distribution post 6/25/15 signing of engagement letter. Def.'s Mot. Summ. J. Ex. 5. Under its interpretation of the Fee Agreement, Jacoby Donner contends that the same spreadsheet shows that Aristone only paid $35,441.26 toward its approximate balance of $725,000 on Existing Matters. Despite their voluminous briefs, the parties fail to provide any explanation that would aid the Court in interpreting the spreadsheet. Accordingly, the Court concludes that there is a genuine issue of material fact as to the amount Aristone paid on Existing Matters after the execution of the Fee Agreement.

Pa. 637, 976 A.2d 474, 483 (Pa. 2009).  The Court concludes that summary judgment on Jacoby Donner's breach of contract claim is inappropriate on the ground that the Fee Agreement is ambiguous with respect to Aristone's payment obligations.

The agreement of two parties as to a balance on an account generally constitutes a promise to pay that account.  *See, e.g.*, *Telebase Systems, Inc. v. Gateway Comm'ns, Inc.*, No. CIV.A. 87-4526, 1988 WL 21845, at *3 (E.D. Pa. Mar. 2, 1988) ("Though there may be no express promise to pay, yet from the very fact of stating the account the law raises a promise as obligatory as if expressed in writing, to which the same legal incidents attach as if a note or bill were given for the balance.").  In this case, however, the Fee Agreement only provides for a balance in "approximate current amounts," not a sum certain.  Fee Agreement 1. Such an approximation is ambiguous "in that [its] indistinctiveness makes [its] meaning uncertain and capable of more than one reasonable definition."  *Wahnschaff Corp. v. OE. Clark Paper Box Co.*, 304 S.E.2d 91, 92–93 (Ga. App. 1983); *see also City of Clinton, Ill. v. Moffitt*, 812 F.2d 341, 343 (7th Cir. 1987) (noting that "'approximately' has no fixed meaning and the deviation of less than 10 percent is not necessarily precluded by the use of so vague a word"); *Energy v. Dte Coal Servs.*, No. 08-173-ART, 2008 U.S. Dist. LEXIS 144522, at *12 (E.D. Ky. Dec. 5, 2008) ("Whether it modifies the key term of the contract or a secondary term, 'approximately' is still ambiguous."); *cf. Logan v. D.W Sivers Co.*, 169 P.3d 1255, 1260 (Or. 2007) ("There is no question that the words 'approximately fifteen (15) days' are ambiguous in this context and that, as such, it is for the trier of fact to ascertain what the parties intended by those words.").

In the multiple briefs filed in support of its motion for partial summary judgment, Jacoby Donner fails to address the patent ambiguity created by the term "approximate amounts."  *See Steuart v. McChesney*, 444 A.2d 659, 663 (Pa. 1982) (noting that a patent ambiguity "appears on

the face of the instrument, and arises from the defective, obscure, or insensible language used")
(internal quotation marks omitted).  To the contrary, Jacoby Donner selectively quotes from the
Fee Agreement to exclude the word "approximate," thereby giving the false impression that the
parties agreed to a balance in the precise amount of $725,000.  Based on the plain meaning of
"approximate," it cannot be determined as a matter of law that the parties agreed Aristone would
pay a total of $725,000 for Existing Matters as of June 25, 2015.  *See Synthes, Inc. v. Emerge
Med.*, Inc., 25 F. Supp. 3d 617, 680 (E.D. Pa. 2014) (stating that Pennsylvania courts apply the
"plain meaning rule" in interpreting contracts).  As such, the Court rejects Jacoby Donner's
argument that the Fee Agreement is unambiguous with respect to Aristone's payment
obligations.

       The Court also concludes that extrinsic evidence does not resolve the ambiguity created
by the term "approximate" in the Fee Agreement.  *See Bohler-Uddeholm Am., Inc. v. Ellwood
Grp., Inc.*, 247 F.3d 79, 93 (3d Cir. 2001) (noting that when a court determines that a contract is
ambiguous, it may "look outside the 'four corners'" of the contract and consider extrinsic
evidence to resolve the ambiguity).  Attorney Diaz testified that he wrote the Fee Agreement
after other partners at Jacoby Donner expressed their concerns about Aristone's growing unpaid
legal bills and pressured him "to put something in writing acknowledging that there are [existing]
matters and receivables associated with them."  Diaz Day 1 Dep. 261:9–25.  The record contains
evidence that, except for the new monthly minimum payment requirement of $10,000, Attorney
Diaz and McGrath intended that the alleged "hybrid contingency" fee arrangement continue with
respect to Existing Matters.  For example, Attorney Diaz stated that the approximate balance of
$725,000 in the Fee Agreement was a "hope note" and that he did not expect Aristone to ever
pay the full amount.  *Id.* at 275:14–25.  According to Attorney Diaz, agreeing on an accurate

balance was unnecessary because he and McGrath understood that they would reevaluate total unpaid fees at a later date, as they had under their previous unwritten agreement. *Id.* at 267:17–268:10. Attorney Diaz further testified that he thought his use of the term "'approximate amounts' [was] indicative of a future reconciliation.'" *Id.* Jacoby Donner disputes that it ever engaged in the ongoing renegotiation of legal fees described by Attorney Diaz and McGrath. Pl.'s Resp. Defs.' Mot. Summ. J. 7. On that record, the Court concludes that interpretation of the Fee Agreement—specifically the provision for an "approximate" balance of $725,000 on Existing Matters—is a task for the jury. *See Hullett v. Towers, Perrin, Forster & Crosby*, 38 F.3d 107, 111 (3d Cir. 1994).

For the foregoing reasons, the Court denies Jacoby Donner's motion for partial summary judgment and that part of defendants' motion seeking summary judgment on Jacoby Donner's breach of contract claim (Count I).

### 2. Account Stated (Count II)

In Count II, Jacoby Donner asserts a claim of account stated against Aristone. Account stated is a variety of a traditional contract claim that "arises when two parties, who engage in a series of transactions with one another, come together to balance the credits and debits and fix upon a total amount owed." *Richburg v. Palisades Collection* LLC, 247 F.R.D. 457, 465 (E.D. Pa. 2008). When this final tally is accepted, "the cause of action is based on the account stated and not the underlying contract." *Rochester Drug Coop., Inc. v. Goodheart Pharmacy, Inc.*, No. 16-1787, 2016 WL 6920465, at *5 (E.D. Pa. Nov. 23, 2016). Under Pennsylvania law, a plaintiff must establish the following elements to support an account stated claim: "(1) there has been a running account, (2) a balance remains due, (3) the account has been rendered upon

the defendant, and (4) the defendant has assented to the account." *Citibank (S.D.), N.A. v. Ambrose*, 13 Pa. D. & C. 5th 402, 405 (Pa. Ct. Comm. Pl. 2010).

The parties do not contest that the first element of an account stated claim is satisfied in this case: Aristone accumulated a running balance of unpaid legal fees. However, Aristone argues, *inter alia*, that because the Fee Agreement only included an approximate balance, Jacoby Donner has failed to establish the third and fourth elements—that the account was rendered unto Aristone and that Aristone assented to the account. The Court agrees with Aristone on this issue.

"The essence of an account stated is that there is an agreement to, or acquiescence in the correctness of the account, so that in proving the account stated, it is not necessary to show the nature of the original transaction or indebtedness." *Connolly Epstein Chicco Foxman Engelmyer & Ewing v. Fanslow*, No. CIV. A. 95-2835, 1995 WL 686045, at *5 (E.D. Pa. Nov. 15, 1995). The Court determines that such "acquiescence in the correctness of the account" is inconsistent with a written agreement, as in this case, that contains only "approximate" amounts. *Cf. EBC, Inc. v. Clark Bldg. Sys.*, No. CIV.A. 05-CV-01549, 2007 WL 4563518, at *9 (W.D. Pa. Dec. 21, 2007) (granting defendant's motion for summary judgment on an account stated claim where the letters in question failed to, *inter alia*, provide a "specific dollar amount"). Other courts addressing this question have reached the same conclusion. For example, the Supreme Court of Montana has held that "the single indispensable ingredient in an account stated is an exact, certain, and definite balance arrived at by the debtor and creditor." *Nelson v. Mont. Iron Mining Co.* 371 P.2d 874, 876 (Mont. 1962). Absent that "indispensable ingredient," no reasonable jury could determine that Jacoby Donner rendered the account upon Aristone and that Aristone assented to the account. Aristone's motion for summary judgment is therefore granted with respect to Jacoby Donner's account stated claim (Count II).

26

3.      *Unjust Enrichment (Count III)*

Finally, defendants move for summary judgment with respect to Jacoby Donner's unjust

enrichment claim (Count III).  Under Pennsylvania law, an unjust enrichment claim requires

proof of three elements: "[1] benefits conferred on defendant by plaintiff, [2] appreciation of

such benefits by defendant, and [3] acceptance and retention of such benefits under such

circumstances that it would be inequitable for defendant to retain the benefit without payment of

value." *Joyce v. Erie Ins. Exchange*, 74 A.3d 157, 169 (Pa. Super. Ct. 2013) (quoting

*Stoeckinger v. Presidential Fin. Corp. of Delaware Valley*, 948 A.2d 828, 833 (Pa. Super. Ct.

2008)).  Importantly, the doctrine of unjust enrichment is not applicable "when the relationship

between the parties is founded on a written agreement or express contract." *Combustion Sys.*

*Servs. v. Schuylkill Energy Res.*, No. CIV. A. 92-4228, 1993 WL 523713, at *5 (E.D. Pa. Dec.

10, 1993).  Despite this restriction, "[a] plaintiff is permitted to plead alternative theories of

recovery based on breach of contract and unjust enrichment in cases where there is a 'question as

to the validity of the contract in question.'" *Premier Payments Online, Inc. v. Payment Systems*

*Worldwide*, 848 F. Supp. 2d 513, 527 (E.D. Pa. 2012) (quoting *AmerisourceBergen Drug Corp.*

*v. Allscripts Healthcare, LLC*, No. CIV.A. 10-6087, 2011 WL 3241356, at *3 (E.D. Pa. July 29,

2011)).

The Court first addresses Jacoby Donner's unjust enrichment claim against Aristone.

Jacoby Donner argues that its unjust enrichment claim should be permitted to proceed because

Aristone "at times appears to dispute the validity of the Fee Agreement."  Pl.'s Resp. Defs.' Mot.

Summ. J. 9.  However, defendants at no point have disputed that the Fee Agreement was a valid

and enforceable contract that governed the relationship between Jacoby Donner and Aristone

from June 25, 2015, until early April 2016, when the parties' professional relationship ended.  At

most, Aristone contends that certain provisions of the Fee Agreement are ambiguous, not invalid or unenforceable. *See, e.g.*, *Teva Pharm. Indus. v. UnitedHealthcare Servs.*, No. 16-4870, 2018 WL 1898911, at *11 (E.D. Pa. Apr. 20, 2018) ("The definiteness requirement, however, does not mean that the presence of any interpretive ambiguity renders an agreement unenforceable."). Because Jacoby Donner has failed to produce any evidence that it performed "wholly outside the scope of the contract," *Combustion Sys. Servs.*, 1993 WL 523713, at *5, its unjust enrichment claim against Aristone fails as a matter of law. *See, e.g.*, *Apparel Bus. Sys., LLC v. Tom James Co.*, No. 06-1092, 2008 WL 858754, at *17 (E.D. Pa. Mar. 28, 2008) (granting defendant's motion for summary judgment on plaintiff's unjust enrichment claim where both parties agreed that a valid contract governed their relationship).

The Court next turns to Jacoby Donner's unjust enrichment claim against McGrath and Lippiatt. Unlike Aristone, McGrath and Lippiatt did not enter a contractual relationship with Jacoby Donner. *See Jacoby Donner, P.C.*, No. 17-2206, 2018 WL 1609341, at *3 (noting that McGrath signed the Fee Agreement "on Behalf of Aristone") (E.D. Pa. April 2, 2018). However, Jacoby Donner has provided no evidence that Lippiatt and McGrath—rather than Aristone—benefited directly from the legal services performed by Jacoby Donner, as required to establish an unjust enrichment claim. Accordingly, the Court grants defendants' motion for summary judgment on Jacoby Donner's unjust enrichment claim against McGrath and Lippiatt (Count III).

### C.     Jacoby Donner's Motion to Pierce the Corporate Veil

In pursuing a judgment for unpaid legal fees against defendants, Jacoby Donner seeks to "pierce" the corporate veil of Aristone and hold its principals, McGrath and Lippiatt, liable as

Aristone's alter egos.  For the reasons that follow, the Court denies Jacoby Donner's motion to pierce the corporate veil.

"Piercing the corporate veil 'is an equitable remedy whereby a court disregards the existence of the corporation to make the corporation's individual principals and their personal assets liable for the debts of the corporation.'"  *Clientron Corp. v. Devon IT, Inc.*, 894 F.3d 568, 576 (3d Cir. 2018) (quoting *In re Blatstein*, 192 F.3d 88, 100 (3d Cir. 1999)).  Importantly, "[t]hat remedy is available only if it is also shown that a corporation's affairs and personnel were manipulated to such an extent that it became nothing more than a sham used to disguise the alter ego's use of its assets for his own benefit in fraud of its creditors."  *Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1521 (3d Cir. 1994).  The corporate veil piercing doctrine is applicable in the contexts of both corporations and limited liability companies, as in this case. *Power Line Packaging, Inc. v. Hermes Calgon/THG Acquisition LLC*, No. 7 EDA 2016, 2017 WL 90617, at *30 (Pa. Super. Ct. Jan. 10, 2017).

Under Pennsylvania law, courts "recognize[] a strong presumption against piercing the corporate veil," *Lumax Indus., Inc. v. Aultman*, 669 A.2d 893, 895 (Pa. 1995), and uphold the corporate entity "unless specific, unusual circumstances call for an exception," *Mark Hershey Farms, Inc. v. Robinson*, 171 A.3d 810, 816 (Pa. Super. Ct. 2017).  In determining whether to set aside the corporate form, courts consider the following factors: "(1) undercapitalization; (2) failure to adhere to corporate formalities; (3) substantial intermingling of corporate and personal affairs; and (4) use of the corporate form to perpetrate a fraud."  *Wen v. Willis*, No. CV 15-1328, 2015 WL 6379536, at *5 (E.D. Pa. Oct. 22, 2015).  Although each factor need not be present, piercing the corporate veil requires that the moving party demonstrate that "the corporation was an artifice and a sham to execute illegitimate purposes and [an] abuse of the corporate fiction and

immunity that it carries." *Kaplan*, 19 F.3d at 1521 (quoting *Wheeling-Pittsburgh Steel Corp. v. Intersteel, Inc.*, 758 F. Supp. 1054, 1058 (W.D. Pa. 1990)).

In this case, Jacoby Donner argues that Aristone is a "mere alter ego" for McGrath and Lippiatt on the grounds that Aristone (1) commingled Aristone funds with the personal funds of McGrath and Lippiatt and the funds of other business entities, (2) failed to observe corporate formalities, (3) is undercapitalized, and (4) is a "sham corporation for the purpose of defrauding creditors." Pl.'s Mot. to Pierce 1. The Court addresses each factor in turn.

> 1.   *Intermingling of Corporate and Personal Affairs by Commingling of Funds*

The "substantial" intermingling or commingling of corporate and personal affairs is one factor weighing in favor of piercing the corporate veil. *Lumax Indus.*, 669 A.2d at 895; *Lieberman v. Corporacion Experienca Unica, S.A.*, 226 F. Supp. 3d 451, 469–70 (E.D. Pa. 2016). As evidence of commingling, Jacoby Donner first points to documents that show Aristone paid some of McGrath and Lippiatt's personal expenses. Specifically, Aristone check registers from 2012 and 2013 produced during discovery include multiple entries for Aristone payments toward McGrath's home mortgage and property taxes. Pl.'s Mot. to Pierce 5–6. With respect to Lippiatt, those same check registers include entries for Aristone payments of the following:

- $3,250.00 and $2,673.13 to a retailer of residential stone products. Lippiatt's home address is included in the payment descriptions;

- $4.00 and $12.00 for EZ Pass violations by Lippiatt;

- $528.32 and $75.00 for parking tickets received by Lippiatt;

- $286.29 for "Todd's iphone replacement";

- $159.00 for "[r]estoration of Todd Lippiatt's shoes";

- $508.99 for "[r]eimbursement for paying the difference owed for Todd's Brazil visa application, the Laudee chocolate order and color copies from Kinko's";

- A $50,000 transfer to "Todd Lippiatt's personal Doral bank account";

- $19.61 for "Messenger Fee for Todd's 2011 taxes"; and

- A $5,000 withdrawal for "TODD????"

*Id.* at 8–9.  In addition, Jacoby Donner notes that the 2012 and 2013 check registers include multiple entries for payments that Aristone made on behalf of other entities owned or operated by McGrath and Lippiatt, including those in which Aristone did not own an interest.  *Id.* at 9–11.

The Court concludes that the above-described evidence does not establish "substantial intermingling" sufficient to pierce Aristone's corporate veil.  Critically, the Aristone LLC Agreement provides for payment distributions to McGrath and Lippiatt and sets no limits on the use of any such distributions to its members.  *See* Defs.' Resp. Mot. to Pierce 10, Ex. B ("Aristone LLC Agreement").  Moreover, while the record shows that Aristone disbursed funds for members' personal expenses, Jacoby Donner fails to establish that personal funds were mixed with company funds.  The fact that Aristone documented these disbursements in company records further "undercuts an alter ego theory." *Wen*, 2015 WL 6379536, at *6; *see also In re Blatstein*, 226 B.R. at 159 ("[I]t is neither illegal nor improper for closely-held corporations . . . to pay personal expenses [of officers], provided that such transactions are properly documented.").

### 2.     *Failure to Observe Corporate Formalities*

Jacoby Donner next argues that Aristone fails to observe corporate formalities.  Significantly, "[n]ot every disregard of formalities justifies piercing the veil, but deviations should be considered in the overall picture." *In re LMcD, LLC*, 405 B.R. 555, 561 (Bankr. M.D. Pa. 2009).  In addition, the corporate formality requirements under Pennsylvania law are "less

31

stringent" in the context of LLCs than in the context of corporations.  *Id.* (citing Mark C. Larson, *Piercing the Veil of Pennsylvania Limited Liability Companies,* 75 Pa. B.A. Q. 124 (2004)); *see also see Klein v. Weidner*, No. CIV.A. 08-3798, 2010 WL 571800, at *8 (E.D. Pa. Feb. 17, 2010), *aff'd*, 729 F.3d 280 (3d Cir. 2013) ("[U]nlike corporations, LLCs need not observe many formalities.").  With respect to the question of corporate formalities in this case, Jacoby Donner only cites deposition testimony by McGrath that Aristone principals "never have member meetings" and that, as a result, "there are no meeting minutes."  McGrath Dep. 47:15–23, 313:5–18.  Such evidence does not justify piercing Aristone's corporate veil because member meetings are not required by either Aristone's LLC Agreement or the Delaware Limited Liability Company Act, Del. Code Ann. tit. 6, § 18-101, *et seq*.

### 3.    Undercapitalization

Third, Jacoby Donner argues that Aristone is undercapitalized on the ground that Aristone failed to pay legal fees for real estate projects that it contends did not generate sufficient revenue.  *See* McGrath Dep. 74:15–22, 78:12–16.  A corporate entity is undercapitalized if it does "not have enough capital to carry on its business."  *Fletcher-Harlee Corp. v. Szymanski*, 936 A.2d 87, 100 (Pa. Super. Ct. 2007); *see also Undercapitalization, Black's Law Dictionary* (11th ed. 2019) (defining "undercapitalization" as "[t]he financial condition of a firm that does not have enough capital to carry on its business").  In this case, Aristone produced evidence that it paid approximately $1.5 million in legal fees during the parties' relationship.  Defs.' Resp. Pl.'s Mot. to Pierce Ex. D.  In addition, the record establishes that Aristone continued to undertake new projects during the course of its relationship with Jacoby Donner.  Based on the foregoing, the Court concludes that Aristone's failure to fully pay its legal fees does not alone establish undercapitalization for purposes of piercing the corporate veil.  *Cf. Lieberman*, 226 F.

32

Supp. 3d at 469 (distinguishing "undercapitalization" from "underperformance").

### 4.     Use of the Corporate Form to Perpetrate a Fraud

Finally, Jacoby Donner asserts that Aristone conducts its business for the purpose of defrauding its creditors.  Specifically, Jacoby Donner argues that Aristone is a "sham corporation" on the grounds that defendants (1) "use [Aristone] to assume the debts of other business entities while making distributions to owners, investors, and managers before creditors," (2) that Aristone has a "history of fraudulent conveyances," and (3) that Aristone has been structured to be judgment proof.  Pl.'s Mot. to Pierce 13, 15, 16.  The Court rejects these arguments.

When determining whether to pierce the corporate veil on the basis of fraud, the Court assesses whether plaintiff has established the elements of a fraud claim under Pennsylvania law. *See, e.g.*, *In re LMcD, LLC*, 405 B.R. at 562.  In Pennsylvania, a claim of fraud requires proof of six elements:

> (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

*Blumenstock v. Gibson*, 811 A.2d 1029, 1034 (Pa. Super. Ct. 2002).  On this issue, Jacoby Donner attempts to establish a claim of fraud by citing Aristone's failure to fully pay its legal bills and the fact that Aristone affiliate AH DB has been sued for fraud in connection with the failed Rocky Aspen project.  Pl.'s Mot. to Pierce 15–16.  Such facts alone, however, do not support a claim for fraud.

Aristone has produced evidence that Jacoby Donner was aware of the corporate structure of Aristone and its affiliate SPLs—namely that Jacoby Donner agreed to compensation based on

the performance of those entities.  That knowledge of Aristone's corporate structure weighs against piercing the corporate veil on the basis of fraud.  *See In re Nutri/Sys., Inc.*, 169 B.R. 854, 871 (Bankr. E.D. Pa. 1994), *aff'd sub nom. In re Nutri/Sys. of Fla. Assocs.*, 178 B.R. 645 (E.D. Pa. 1995) (noting that although "Defendants took certain actions in order to gain control of the Debtors and acquire the Bank Group's senior secured position . . .  this design was fully disclosed to and supported most of the parties who took an active role in the bankruptcy cases"); *cf. In re Rosecrest Enterprises, Inc.,* 80 Bankr. 354, 357 (Bankr. W.D. Pa. 1987) ("Debtor knowingly dealt with Highland in its corporate capacity, fully realizing that Highland was formed solely for the asset purchase. . . .[and] Debtor cannot now assert the propriety of Highland's dealings with third parties as a reason for piercing the corporate veil.").

### 5.    Conclusion

In sum, the above-discussed factors fail to overcome the "strong presumption" against disregarding Aristone's corporate form.  *Lumax Indus.*, 669 A.2d at 895.  The Court therefore denies Jacoby Donner's motion to pierce the corporate veil.

## V.    MALPRACTICE CLAIMS

The Court next turns to the parties' motions related to Aristone's[8] Malpractice Claims. The Court first addresses the parties' *Daubert* motions regarding proposed expert testimony on malpractice liability and damages before turning to Jacoby Donner's motion for summary judgment on Aristone's malpractice counterclaim.

---

[8] The Court notes again that individual defendants McGrath and Lippiatt were dismissed from the Malpractice Claims for lack of standing by Memorandum and Order dated April 2, 2018.  *See Jacoby Donner, P.C.*, 2018 WL 1609341, at *3 (concluding that McGrath and Lippiatt failed to allege "distinct individual injuries and lack standing" to assert the Malpractice Claims).  Despite the dismissal of McGrath and Lippiatt's counterclaims, all defendants— McGrath, Lippiatt, and Aristone—filed a *Daubert* motion and various responses related to the Malpractice Claims.

A.     *Daubert* **Motions Regarding Expert Testimony on Malpractice Liability and Damages**

Jacoby Donner moves to exclude the testimony of Aristone's proposed malpractice liability and damages experts, Attorney Leibundgut and John Agogliati, while Aristone moves to exclude the testimony of Jacoby Donner's proposed liability expert, Attorney Griffith.  The Court evaluates these motions in turn, first addressing the parties' proposed liability experts, Attorneys Leibundgut and Griffith.

1.     *Peter Leibundgut, Esquire*

Attorney Leibundgut is a transactional attorney who was retained by Aristone to provide an expert opinion regarding, *inter alia*, the applicable professional standard of care and issue of proximate cause in support of the Malpractice Claims.  Attorney Leibundgut offers four main conclusions in his reports and testimony with respect to Aristone's Malpractice Claims:

- An attorney-client relationship existed between Jacoby Donner and defendants.

- Jacoby Donner owed defendants "a duty to represent them in keeping with the professional standards required by the nature of the Transactions, to provide appropriate advice and guidance and take the necessary and appropriate legal and documentary steps to protect and safeguard Defendants' interests in connection with the Transactions as discussed in the body of this Report."

- "Plaintiff breached the duty it owed Defendants by failing to adhere to the most basic professional standards of care an attorney owes a client in the Transactions as outlined in this Report."

- "Plaintiffs failure to adhere to the professional standards of care and provide the proper guidance, documentation and professional services . . . was a substantial contributing factor to Defendants' losses in the Transactions [and] negligent at a most basic level."

Leibundgut Rep. 1.

Jacoby Donner primarily argues that Attorney Leibundgut's reports and testimony fail the reliability prong of Rule 702 on the grounds that he (1) "merely restated the opinions of Patrick

McGrath and [Aristone's] counsel, Krishna Narine," (2) failed to review the relevant

Pennsylvania legal authority on malpractice, and (3) generally "failed to follow the methodology

of a 'legal' witness in a malpractice action."  Countercl. Def.'s *Daubert* Mot. to Preclude Expert

Rep. and Test. of Proposed Legal Expert Peter W. Leibundgut 17–18.

       The Court need not reach the issue of reliability on the ground that Attorney

Leibundgut's reports and testimony do not "fit" the disputed facts in this case.  For expert

testimony to meet the "fit" requirement, it must "help the trier of fact to understand the evidence

or to determine a fact in issue."  Fed. R. Evid. 702.  Fit "goes primarily to relevance.  Expert

testimony which does not relate to any issue in the case is not relevant and, ergo, non-

helpful."  *Daubert*, 509 U.S. at 591 (internal quotation marks omitted).

       The opinions of Attorney Leibundgut are not relevant to a determination of malpractice

liability because Aristone failed to provide evidence of actual loss resulting from Jacoby

Donner's legal work.  In order to succeed on its claim of legal malpractice, Aristone must

demonstrate the "(1) employment of the attorney or other basis for a duty; (2) the failure of the

attorney to exercise ordinary skill and knowledge; and (3) that such negligence was the

proximate cause of damage to the plaintiff."  *Kituskie v. Corbman*, 714 A.2d 1027, 1029 (Pa.

1998).  "An essential element" of a legal malpractice claim "is proof of actual loss rather than a

breach of a professional duty causing only nominal damages, speculative harm or the threat of

future harm."  *Id.*

       Each of the above-described elements must be supported by record evidence for

Aristone's malpractice claim to proceed past summary judgment.  In this Memorandum, for the

reasons discussed *infra* in Section V.B., the Court concludes that Jacoby Donner's motion

for summary judgment must be granted due to Aristone's failure to produce evidence of any

actual loss it suffered as a result of Jacoby Donner's legal work.  Because the Court concludes

that there is no evidence of actual loss to sustain Aristone's malpractice claim, no material

questions of fact remain.  Consequently, Attorney Leibundgut's opinions on legal malpractice

liability are irrelevant and fail to meet the "fit" requirement of Rule 702.  *See, e.g.*, *Stagnaro v.

Target Corp.*, No. 16-3535, 2019 WL 1934871, at *9 (E.D. Pa. Apr. 30, 2019) (DuBois, J.) (in a

slip-and-fall case, excluding expert's testimony on building code and industry safety standards

where the Court determined that plaintiff failed to produce evidence of causation).  For the

foregoing reasons, Jacoby Donner's motion to exclude the testimony of Attorney Leibundgut in

support of the Malpractice Claims is granted.

2.    *James Griffith, Esquire*

In its defense against Aristone's Malpractice Claims, Jacoby Donner offers the expert

testimony and amended report of Attorney Griffith.  Aristone argues that Attorney Griffith fails

as an expert witness under two of the three Rule 702 requirements: qualifications and reliability.

The Court need not reach those arguments.

As discussed above, based on Aristone's failure to produce evidence of actual loss—an

essential element of a malpractice claim under Pennsylvania law—and the Court's decision to

exclude the testimony of Attorney Leibundgut, Attorney Griffith's conclusions regarding the

professional standard of care and Jacoby Donner's liability are irrelevant.  In this Memorandum,

for the reasons discussed *infra* in Section V.B., the Court concludes that Jacoby Donner's motion

for summary judgment must be granted due to Aristone's failure to produce evidence of actual

loss it suffered as a result of Jacoby Donner's legal work.  Because the Court concludes that

there is no evidence of actual loss to sustain Aristone's malpractice claim, no material issues of

37

fact remain.  Consequently, Attorney Griffith's opinions on the professional standard of care and causation are irrelevant and fail to meet the "fit" requirement of Rule 702.

In his amended report and deposition testimony, Attorney Griffith offers additional opinions that warrant the Court's consideration under the Federal Rules of Evidence. Specifically, Attorney Griffith opines on: (1) the applicability of the two-year statute of limitations in professional malpractice cases under Pennsylvania law; (2) Aristone's alleged contributory negligence in connection with the Restaurant Claim; (3) the applicability of the doctrine of judicial estoppel to bar the Rocky Aspen Claim; and (4) the "role of an expert witness" under Rule 702.  The Court concludes that those opinions are impermissible legal opinions prohibited by Federal Rule of Evidence 704.

Under Rule 704, an expert witness may give testimony that "embraces an ultimate issue to be decided by the trier of fact," but is prohibited from "testify[ing] as to the governing law of the case" and stating a legal opinion.  *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) (internal quotation marks omitted).  While "[t]he boundaries of Rule 704 are often hazy," *Patrick v. Moorman*, 536 F. App'x 255, 258 (3d Cir. 2013), the Third Circuit prohibits expert testimony that "would usurp the District Court's pivotal role in explaining the law to the jury." *Berckeley*, 455 F.3d at 217.  In the context of expert attorney witnesses, the witness "may not instruct the trier of fact as to the law," but may testify "concerning the facts surrounding contract negotiations, for example, or the ordinary practices of those engaged in certain occupations or industries." *Haberern v. Kaupp Vascular Surgeons Ltd. Defined Benefit Plan & Tr. Agreement*, 812 F. Supp. 1376, 1378 (E.D. Pa. 1992).  Testimony by Attorney Griffith on the above-enumerated subjects—which involves the application of legal principles and doctrines to the facts of this case—clearly exceeds the proper role of an expert witness.  *See Quagliarello v.*

*Dewees*, 802 F. Supp. 2d 620, 624 (E.D. Pa. 2011) (barring "opinions phrased in inadequately explored legal criteria") (internal quotation marks omitted).

Based on all the foregoing, Aristone's motion to exclude the testimony of Attorney Griffith is granted.

### 3.     *John Agogliati, CFA, ASA*

Aristone offers the testimony of John Agogliati, a Certified Financial Analyst ("CFA") and Accredited Senior Appraiser in business valuation ("ASA"), on malpractice damages.  Based on the general assumption that Jacoby Donner is liable for legal malpractice in connection with the CS Paradiso matter and Rocky Aspen venture, Agogliati opines that Jacoby Donner's malpractice resulted in a total of $10,601,217.01 in damages: (1) $410,000 for "unnecessary settlement payments"; (2) $1,011,602.04 in fees for "remedial" legal work; and (3) $9,179.614.97 in lost investment value in connection with Rocky Aspen.  Agogliati Rep. 10.  Jacoby Donner challenges Agogliati's report and testimony for failing to meet the reliability requirement under Rule 702.

The Court first addresses a fundamental flaw in Agogliati's report that undercuts its "fit" to the facts of this case.  In the introduction of his report, Agogliati provides that he was retained "to provide an independent and objective opinion regarding the damages incurred by Aristone Realty Capital, LLC ('Aristone'), Todd M. Lippiatt ('Mr. Lippiatt') and/or Patrick M. McGrath ('Mr. McGrath' and, together with Aristone and Mr. Lippiatt, 'Defendants') with regards to this matter."  Agogliati Rep. 2.  Critically, Lippiatt and McGrath are not parties to the Malpractice Claims.  As such, expert testimony on any financial losses they may have personally incurred in connection with the Rocky Aspen venture or CS Paradiso matter will not assist "the trier of fact to understand the evidence or to determine a fact in issue" in this case.  Fed. R. Evid. 702.

Expert testimony regarding any such personal losses by Lippiatt or McGrath thus fails to satisfy the "fit" requirement under *Daubert*.

The Court next addresses each of Agogliati's opinions to determine whether they satisfy the requirements of Rule 702.  *See Schneider*, 320 F.3d at 404.

a.    <u>Settlement Payments</u>

In opining on Aristone's damages, Agogliati purports to calculate the total amount of Aristone settlement payments to resolve litigation resulting from Jacoby Donner's alleged malpractice.  With respect to the TVPOA II Settlement Claim, he states in his report that "[i]t is my understanding that the settlement amount was ultimately increased to $330,000."  Agogliati Rep. 5–6.  With respect to the HSVPOA default judgment, Agogliati states that "I understand that Aristone (through [CS Paradiso]) ultimately negotiated this judgment to a settlement of approximately $80,000."  Agogliati Rep. 5–6.  He further states that "based upon the assumption" that neither lawsuit would have occurred "but for the professional malpractice and neglect of Jacoby [Donner], the damages suffered by Aristone for unnecessary settlement payments" are the sum of the two settlements, $410,000.  Agogliati Dep. 6–7.

Under *Daubert* and its progeny, it is paramount that an expert's testimony rest on "good grounds, based on what is known."  *Mitchell*, 365 F.3d at 244 (quoting *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)).  In this case, Jacoby Donner generally contends that Agogliati's conclusions do not rest on "good grounds" because, in calculating Aristone's alleged damages, Agogliati failed to verify the underlying data and merely used "simple arithmetic"[9] to tally figures provided to him by Aristone's counsel.  Countercl.

---

[9] To the extent that Jacoby Donner argues that the simplicity of Agogliati's analysis is alone a basis for exclusion under Rule 702, that argument is rejected.  Courts have held that an expert's specialized knowledge, even if it involves application of a seemingly simple methodology, may still satisfy Rule 702 if it is "helpful to the trier of fact."  *See, e.g.*, *Total Control, Inc. v. Danaher Corp.*, 338 F. Supp. 2d 566, 569 (E.D. Pa. 2004) (rejecting the

Def.'s Mot. to Preclude Expert Rep. and Test. of Proposed Valuation Expert John Agogliati, III, CFA, ASA 2.

Under the *Daubert* analysis, experts are permitted to make assumptions in formulating their opinions, but "the supporting assumption must be sufficiently grounded in sound methodology[]and reasoning to allow the conclusion it supports to clear the reliability hurdle." *In re TMI Litig.*, 193 F.3d at 677. The Court finds multiple unsupported assumptions and flaws underlying Agogliati's calculation of damages based on settlement payments that render his opinion unreliable under *Daubert*. First, and most significantly, the assumption that payments and obligations incurred by a distinct legal entity, CS Paradiso, constitute "damages suffered by Aristone" is unsupported by the record and Agogliati's report and deposition. *See* Agogliati Rep. 5. In fact, at various points in his report and testimony, Agogliati conflates Aristone with the distinct SPLs established to carry out the various real estate projects. *See* Agogliati Rep. 6–7, 9. Second, Agogliati stated that he did not determine whether the TVPOA II Settlement Agreement or HSVPOA default judgment settlement were actually paid or which entity was to pay them. Agogliati Dep. 70:21–23; 77:11–18. The Third Circuit has emphasized that "the reliability analysis [required by *Daubert*] applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012) (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999)). In light of his failure to ascertain basic facts about the two settlement agreements at issue—whether Aristone paid, or was obligated to pay, any part of the settlements—Agogliati's tabulation of alleged settlement payments does not "rest

---

argument that a financial analyst's testimony should be excluded because his damage calculations were based on simple arithmetic and determining that the expert's "ability to present a vast quantity of calculations derived from disparate sources in an understandable format will assist the jury"); *see also Cromeans v. Morgan Keegan & Co.*, No. 2:12-CV-04269-NKL, 2014 U.S. Dist. LEXIS 148654, at *4 (W.D. Mo. Oct. 20, 2014) (same).

on good grounds." *Paoli II*, 35 F.3d at 742.  As such, the Court concludes that Agogliati's

opinion regarding Aristone's damages in connection with "unnecessary settlement payments"

will be excluded under Rule 702.

b. <u>Remedial Legal Fees</u>

Agogliati next purports to calculate the additional legal fees that Aristone allegedly

incurred to correct legal work performed by Jacoby Donner.  He opines in his report:

> As a result of the professional malpractice of Jacoby [Donner], Aristone
> was required to pay fees to other attorneys to perform "remedial" work.  It
> is my understanding and assumption that such work was required to fix the
> deficiencies of Jacoby [Donner's] prior work.  Further, Aristone was
> required to defend itself in litigations that would likely have not occurred
> but for the professional malpractice of Jacoby [Donner].

Agogliati Rep. 7.  Agogliati's report includes a table summarizing the total remedial legal fees

expended:

| Law Firm | Dates of Service | Total Fees Incurred |
|---|---|---|
| Kizer & Black, Attorneys, PLLC | July 29, 2016 – January 4, 2018 | $39,387.38 |
| Lare Diaz, LLC | July 8, 2016 – January 8, 2018 | $123,353.50 |
| Dunnington Bartholow & Miller LLP | N/A | $848,861.16 |
| **Total** | | $1,011,602.04 |

Agogliati Rep. 7.

In calculating the sum of remedial legal fees, Agogliati reviewed invoice summaries from

various law firms allegedly retained by Aristone for "remedial work or defense from additional

litigation." *Id.*  The invoice summaries were provided to Agogliati by Aristone. *Id.*  Agogliati

admitted that he did not "audit" the invoices and "d[id] not have any opinion with regards to

their nature." *Id.*  Critically, Agogliati testified that he did not know what legal services were

provided by the "remedial" attorneys or why such work was needed.  Agogliati Dep. 81:22–

82:16.  Further, Agogliati stated that he did not know which entity—Aristone or one of the

legally distinct SPLs—was obligated to pay the invoices or which of the invoices were paid. *Id.*

42

at 38:25–39:21, 80:15–81:2 ("I believe some of [the invoices had a zero balance], and some of them may not have.  But I don't believe all of them were shown as being paid.").  In short, Agogliati presented no evidence that Aristone paid, or was obligated to pay, any of the invoices.

Agogliati's calculation of remedial legal fees is unreliable on the same grounds that his opinion on settlement payments is unreliable.  While the "evidentiary requirement of reliability is lower than the merits standard of correctness," "a court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *In re TMI Litig.*, 193 F.3d at 682 (internal quotation marks omitted).  Such a gap may exist when "experts who use data in their reports [fail to] independently verify[] the accuracy or reliability of those figures."  *Bruno v. Bozuto's Inc.*, 311 FRD 124, 137–38 (M.D. Pa. 2015); *see also Montgomery Cty. v. Microvote Corp.*, 320 F.3d 440, 449 (3d Cir. 2003).  A proposed expert's failure to take any measures to verify data provided by an interested party further weighs against admissibility under the reliability prong of Rule 702.  *See Legendary Art, LLC v. Godard*, No. 11-0674, 2012 WL 3550040, at *5 (E.D. Pa. Aug. 17, 2012).  In preparing his calculations, Agogliati failed to conduct basic due diligence on the invoices provided to him by Aristone—such as determining the type of legal services provided or whether the services were performed on matters that Jacoby Donner had been retained to handle.  Accordingly, the Court concludes that Agogliati's calculation of Aristone's damages with respect to "remedial" legal fees will be excluded as unreliable under Rule 702.

c.    Lost Investment in Rocky Aspen

Finally, Agogliati opines on damages arising from the lost investment in the Rocky Aspen venture.  For purposes of his damages calculation, Agogliati assumed that "but for the actions of Jacoby [Donner], specifically with regards to Jacoby [Donner's] failure to exercise due

43

care with respect to drafting and enforcing contracts and failing to exercise favorable options, AH DB would not have lost its investment in Rocky Aspen." Agogliati Rep. 8.  In addition, Agogliati determined that the "proper measure of damages is the value of AH DB's investment in Rocky Aspen," rather than "other standards of value, such as fair value or fair market value, which are based upon hypothetical investors." *Id.* at 8–9.

To determine the lost investment value of Rocky Aspen, Agogliati relied on the affidavit of Michael Staheli, the Chapter 11 Trustee in Rocky Aspen's bankruptcy proceedings, dated August 1, 2017.  *See* Countercl. Def.'s Mot. to Preclude Expert Rep. and Test. of Proposed Valuation Expert John Agogliati, III, CFA, ASA Ex. C ("Staheli Aff.").  According to the affidavit, AH DB "invested not less than $7,929,614.97 in or on behalf of [Rocky Aspen] prior to December 31, 2016." *Id.* ¶ 17.  In addition, the affidavit states that, "as part of a settlement with [Rocky Aspen's] landlord in July, 2015 and in advance of the opening of the restaurant, the landlord paid in $1,250,000.00 to a construction escrow account, which funds were used to pay construction expenses of [Rocky Aspen]." *Id.* ¶ 18.  Based on those figures, Agogliati concluded that the total value of AH DB's investment in Rocky Aspen is $9,179,614.97.  Agogliati Dep. 9.

Even assuming that Agogliati's opinion on the value of the Rocky Aspen investment is reliable—which Jacoby Donner contests—Agogliati's conclusion regarding AH DB's lost investment will be excluded for lack of "fit."  AH DB is a distinct legal entity from Aristone and not a party to this case.  As such, any testimony regarding AH DB's losses from the failed Rocky Aspen venture is irrelevant and inadmissible under Rule 702.

d.   Conclusion

Based on all of the foregoing, the Court grants Jacoby Donner's *Daubert* motion to exclude the testimony of John Agogliati on damages.

44

B.      **Jacoby Donner's Motion for Summary Judgment**

With these evidentiary rulings in mind, the Court now turns to Jacoby Donner's motion for summary judgment on Aristone's Malpractice Claims.

1.      *Elements of a Legal Malpractice Claim*

Under Pennsylvania law, a plaintiff must establish the following elements to prove a claim of legal malpractice sounding in tort: "(1) employment of the attorney or other basis for a duty; (2) the failure of the attorney to exercise ordinary skill and knowledge; and (3) that such negligence was the proximate cause of damage to the plaintiff." *Kituskie*, 714 A.2d at 1029. The Pennsylvania Supreme Court has emphasized that "[a]n essential element" of a legal malpractice claim "is proof of actual loss rather than a breach of a professional duty causing only nominal damages, speculative harm or the threat of future harm." *Id.* Courts consider damages to be remote or speculative only if "there is uncertainty concerning the identification of the existence of damages rather than the ability to precisely calculate the amount or value of damages." *Id*; *see also Rizzo v. Haines*, 555 A.2d 58, 68 (Pa. 1989) ("Thus, damages are speculative only if the uncertainty concerns the *fact* of damages rather than the amount.") (internal quotation marks omitted).   At the summary judgment stage, a plaintiff need only produce evidence that it suffered an injury—not the precise amount of damages. *See, e.g.*, *ASTech Int'l, LLC v. Husick*, 676 F. Supp. 2d 389, 405 (E.D. Pa. 2009) ("The fact that the precise nature of the damages is uncertain at this stage does not require a grant of judgment in favor of defendants.").

The touchstone of "actual loss" in a legal malpractice claim is proof that "the underlying legal representation would have achieved whatever the plaintiffs hoped to achieve.  If the underlying case, transaction or patent prosecution would have failed regardless of the

defendant's professional negligence, then the plaintiffs have not suffered actual loss." *Id.* at 402.

Thus, a plaintiff's failure to produce evidence of actual loss may be a basis for granting a

defendant's motion for summary judgment in a legal malpractice case. *See, e.g.*, *Gen. Nutrition*

*Corp. v. Gardere Wynne Sewell, LLP*, 727 F. Supp. 2d 377, 383 (W.D. Pa. 2010) ("The Court

need not reach most of the parties' contentions, because it concludes that there is a foundational

flaw in Plaintiff's case, specifically, that Plaintiff cannot establish that it endured any actual loss

or monetary damages.").

> 2.    *Aristone's Standing to Assert a Legal Malpractice Claim Against Jacoby*
>       *Donner*

In its motion for summary judgment, Jacoby Donner primarily[10] argues that Aristone

lacks standing to assert its malpractice claim.  The Court first addressed Aristone's standing in its

Memorandum dated April 2, 2018, adjudicating Jacoby Donner's motion to dismiss Aristone's

counterclaims. *See Jacoby Donner, P.C.*, 2018 WL 1609341, at *1.  In that Memorandum, the

Court concluded that, based on the facts alleged in the Amended Answer, Defenses, and

Counterclaims, Aristone had standing to bring a malpractice suit "[a]s the promisee in a

contractual relationship between Aristone and Jacoby Donner for the benefit of [third party

beneficiaries] AH DB and CS Paradiso." *Id.* at *4.  As discussed *supra*, the Court also dismissed

Aristone's legal malpractice claim sounding in contract (Count I) as barred by the gist of the

action doctrine, leaving only Aristone's malpractice claim sounding in tort (Count II). *Id.* at *4–

5.

---

[10] Jacoby Donner also argues that (1) Aristone fails to satisfy the proximate cause element of a legal malpractice
claim and (2) Aristone's claims are time-barred under the two-year statute of limitations applicable to professional
liability actions in Pennsylvania.  The Court need not reach those arguments given its rulings on the issue of actual
loss. *See Aronow Roofing Co. v. Gilbane Bldg. Co.*, 902 F.2d 1127,1128 (3d Cir. 1990) ("Summary judgment will
be granted where the non-moving party fails to 'establish the existence' of an element essential to the case.")
(quoting *Celotex Corp.*, 477 U.S. at 322 (1986)).

Given the dismissal of the contract claim, Jacoby Donner now argues that the third-party beneficiary doctrine—a theory of contract law—is no longer a basis for Aristone's standing. Jacoby Donner contends that, while Aristone "acted as a conduit for the delivery of legal services to various companies and assumed direct liability for the legal services delivered by Jacoby Donner," Aristone lacks standing to assert its malpractice claim because it was not the beneficiary of Jacoby Donner's legal services. Counterclaim Def.'s Mot. Summary J. 34. The Court disagrees with Jacoby Donner on this issue.

Under Pennsylvania law, "important policies require privity (an attorney-client or analogous professional relationship, or a specific undertaking) to maintain an action in negligence for professional malpractice." *Guy v. Liederbach*, 459 A.2d 744, 746 (Pa. 1983); *see also Golden v. Cook*, 293 F. Supp. 2d 546, 554 (W.D. Pa. 2003) (stating that a plaintiff "must show an attorney-client relationship or a specific undertaking by the attorney furnishing the professional services . . . as a necessary prerequisite for maintaining such suits in trespass" ). In this case, Jacoby Donner—as a party to the Fee Agreement—undertook legal services for the benefit of Aristone and its affiliate SPLs. The Court therefore concludes that the professional relationship between Aristone and Jacoby Donner is sufficient to establish Aristone's standing to assert a legal malpractice claim.

Notwithstanding the Court's conclusion with respect to Aristone's standing, Aristone may not assert a malpractice claim based on harms suffered by distinct legal entities—the affiliated non-party SPLs—or derivative injuries. Indeed, "under Pennsylvania law, courts must be reluctant to disregard corporate formalities by allowing one corporation to recover for actual loss suffered by a distinct and separate corporate entity." *Gen. Nutrition Corp.*, 727 F. Supp. 2d at 386. Relatedly, under the derivative injury rule, shareholders, directors, officers or employees

may not sue for injuries to the corporation. *In re Kaplan*, 143 F.3d 807, 811–12 (3d Cir. 1998); *Adjusters, Inc. v. Computer Sciences Corp.*, 818 F. Supp. 120, 121 (E.D. Pa. 1993). Damages to the shareholder that result indirectly, because of an injury sustained by the corporation, are derivative. *See Hill v. Ofalt*, 85 A.3d 540, 548–49 (Pa. Super. 2014) ("[T]he shareholder must allege a direct, personal injury—that is independent of any injury to the corporation.").

Derivative injuries cannot satisfy the actual loss element of a malpractice claim. *See, e.g.*, *J.W. Hall, Inc. v. Nalli*, No. 771 WDA 2016, 2017 WL 626715, at *5–6 (Pa. Super. Ct. Feb. 15, 2017) (holding that plaintiff corporation failed to satisfy the actual loss requirement of a legal malpractice claim where plaintiff alleged damages that "were, in fact, incurred by separate and distinct entities even though it is undisputed" that those entities and plaintiff corporation were owned by the same individuals). Accordingly, losses suffered by an Aristone SPL—even one in which Aristone owns an interest—will not support a claim of legal malpractice by Aristone. *See Hvizdak v. United States*, No. CIV.A. 14-1296, 2015 WL 5098745, at *3 (W.D. Pa. Aug. 31, 2015) ("The injury must be something separate and distinct from the injury inflicted upon the corporation—something more than diminution in value of investments."). The Court therefore concludes that although Aristone has standing, it may only pursue its Malpractice Claims to the extent that it demonstrates that it suffered direct, personal harm based on Jacoby Donner's conduct.

Based on the foregoing principles, the Court evaluates each of Aristone's Malpractice Claims: (1) the Rocky Aspen Claim, (2) TVPOA II Settlement Claim, (3) HSVPOA Default Judgment Claim, and (4) Servicing Claim.

### 3.    *The Rocky Aspen Claim*

The Court first addresses the Rocky Aspen Claim.  Aristone asserts that Jacoby Donner's alleged malpractice reduced Aristone's equity and control of the ownership in the Rocky Aspen venture and caused those affiliates to lose their investment.  However, the record contains no evidence of any investment by Aristone itself in the Rocky Aspen joint venture.  The parties agree that, while Aristone owned varying percentages of AH DB between 2013 and 2016, Aristone and AH DB are distinct legal entities.  Countercl. Def.'s SUMF ¶ 13; Aristone Resp. Countercl. Def.'s SUMF ¶ 13.  Although Aristone argues that "Aristone, through AH DB," would have been entitled to additional ownership interest in Rocky Aspen had AH DB met its funding obligations under the joint venture agreement, Resp. Countercl. Def.'s Mot. Summ. J. 30, Aristone identifies no record evidence of such entitlement.  As such, Aristone has failed to produce any evidence from which a reasonable jury could determine that Aristone suffered actual loss in connection with Jacoby Donner's representation of AH DB in the Rocky Aspen venture.  Accordingly, Jacoby Donner's motion for summary judgment is granted with respect to the Rocky Aspen Claim.

### 4.    *TVPOA II Settlement Claim*

The Court next turns to the TVPOA II Settlement Claim.  Aristone contends that Jacoby Donner's failure to promptly deliver the quitclaim deed prepared by Attorney Adams resulted in the need to settle the TVPOA II lawsuit and payment of $330,000 under the TVPOA II Settlement Agreement.  However, Aristone has produced no evidence that Aristone—rather than a non-party SPL—was a party to the TVPOA II Settlement Agreement or paid, or was obligated to pay, any part of the settlement.  *See* Resp. Countercl. Def.'s SUMF ¶ 248 (admitting that Aristone had not produced documentation of payment); *see also Gen. Nutrition Corp.*, 727 F.

Supp. 2d at 384 (holding that payment of settlement proceeds by a "separate and distinct corporate entity" affiliated with plaintiff did not constitute "'actual' monetary loss" by plaintiff). As such, Aristone has failed to produce evidence from which a reasonable jury could conclude that Aristone suffered an actual loss due to Jacoby Donner's legal services related to TVPOA II. The Court therefore grants Jacoby Donner's motion for summary judgment with respect to the TVPOA II Settlement Claim.

        5.     *Additional Instances of Alleged Malpractice: HSVPOA Default Judgment Claim and Servicing Claim*

As discussed *supra*, the record contains evidence of two additional putative grounds for Aristone's Malpractice Claims: (1) the HSVPOA default judgment settlement (the "HSVPOA Default Judgment Claim") and (2) Jacoby Donner's purported failure to service the NRP Portfolio by executing routine property transfers, mortgage satisfactions, and amendments pursuant to the NRP Policies and Procedures (the "Servicing Claim"). Critically, Aristone failed to include any mention of the HSVPOA Default Judgment Claim or the Servicing Claim in its Amended Answer, Defenses and Counterclaims. Moreover, Aristone fails to address the challenges to the HSVPOA Default Judgment Claim in its response to Jacoby Donner's motion for summary judgment.

A party may not raise in a response to a motion for summary judgment a claim that was not pled in the complaint. *See Scott v. Calpin*, No. 08-4810 (RMB/AMD), 2012 WL 3019955, at *5 (D.N.J. July 24, 2012) ("To the extent Plaintiff asserts allegations of malpractice that were not pled in his Complaint, they are not before the Court on this motion for summary judgment."); *see also Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 676 F.3d 318, 326 (3d Cir. 2012); *Bell v. City of Phila.*, 275 F. App'x 157, 160 (3d Cir. 2008). In addition, a non-moving party's failure to defend the legal sufficiency of a claim in response to a motion for summary judgment

constitutes an abandonment of that claim.  *See Mason v. Kruczaj*, No. CV 13-6512, 2016 WL

161594, at *8 (E.D. Pa. Jan. 13, 2016); *Hackett v. Cmty. Behavioral Health*, No. CIV.A. 03-

6254, 2005 WL 1084621, at *6 (E.D. Pa. May 6, 2005), *aff'd*, 171 F. App'x 968 (3d Cir. 2006).

Accordingly, the Court grants Jacoby Donner's motion for summary judgment with respect to

the HSVPOA Default Judgment Claim and the Servicing Claim.

## VI.   CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the motions of

Jacoby Donner and defendants, as follows:

1. Collection Claims

   - Jacoby Donner's *Daubert* motion to exclude expert testimony regarding billing practices is granted to the extent it seeks to bar Attorney Leibundgut's testimony on billing practices.  The *Daubert* motion is denied in all other respects.

   - Jacoby Donner's motion to pierce the corporate veil is denied.

   - Jacoby Donner's motion for partial summary judgment on the breach of contract claim (Count I of the Complaint) is denied.

   - Aristone, Lippiatt, and McGrath's motion for summary judgment on the Collection Claims is denied with respect to Jacoby Donner's breach of contract claim (Count I of the Complaint).  The motion is granted with respect to Jacoby Donner's account stated claim (Count II of the Complaint) and unjust enrichment claim (Count III of the Complaint).

2. Malpractice Claims

   - Jacoby Donner's *Daubert* motion to exclude the expert testimony of Attorney Leibundgut in support of the Malpractice Claims is granted.

   - Jacoby Donner's *Daubert* motion to exclude the expert testimony of Mr. Agogliati on malpractice damages is granted.

   - Aristone's *Daubert* motion to exclude the expert testimony of Attorney Griffith in support of the Malpractice Claims is granted.

   - Jacoby Donner's motion for summary judgment on the Malpractice Claims is granted.

51

Only Jacoby Donner's breach of contract claim remains.  An appropriate order follows.[11]

---

[11] By Stipulation and Order dated October 10, 2018, the parties entered into to a Confidentiality Agreement governing the production of confidential discovery material (Document No. 136).  The parties requested that parts of their motion papers under consideration in this Memorandum be filed under seal pursuant to the Stipulation and Order, but said nothing about sealing any part of the Court's Memorandum.  In the event either party concludes that parts of the Memorandum should be sealed, the parties should submit to the Court an agreed-upon sealing order.